USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1569 IN RE: ROSEMARY PYE, ON BEHALF OF NATIONAL LABOR RELATIONS BOARD, Plaintiff, Appellant, v. SULLIVAN BROTHERS PRINTERS, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ John A. Mantz, Attorney for National Labor Relations Board, with _____________ whom Ellen A. Farrell, Assistant General Counsel, Frederick L. __________________ _____________ Feinstein, General Counsel, Robert E. Allen, Associate General _________ _________________ Counsel, and Corinna L. Metcalf, Deputy Assistant General Counsel, ___________________ were on brief for appellant. Robert P. Corcoran with whom Gleeson & Corcoran was on brief for __________________ ___________________ appellee. ____________________ October 26, 1994 ____________________ STAHL, Circuit Judge. The National Labor Relations STAHL, Circuit Judge. _____________ Board appeals the denial of its petition for a preliminary injunction requiring Sullivan Brothers Printers, Inc., to recognize and bargain with Local 600M, Graphic Communications International Union ("GCIU"), AFL-CIO, as the exclusive representative of the Sullivan Brothers pressmen and bookbinders. The issue at the core of the dispute is whether Local 600M had properly assumed the mantle of two smaller, now-defunct locals that formerly represented the company's pressmen and bookbinders. The district court concluded that the Board had failed to demonstrate a likelihood of success in the underlying proceeding and denied its petition for interim relief. Finding no abuse of discretion by the district court, we now affirm. I. I. __ Background Background __________ A. The Demise of Locals 109C and 139B ______________________________________ The relevant facts are undisputed. Sullivan Brothers is a commercial printing concern located in Lowell, Massachusetts. For more than thirty years, two separate locals represented the company's pressmen and bookbinders -- Local 109C and Local 139B, respectively, both affiliates of GCIU. Local 109C was the larger of the two locals, representing in 1990 more than 250 workers at five companies in the Lowell area, including eighteen pressmen at Sullivan -2- 2 Brothers. Local 139B represented about 135 bookbinders and general helpers at two companies in the same area, approximately ten of whom were employed by Sullivan Brothers. The vast majority of the members of each local -- as many as 240 members of 109C, and 125 members of 139B -- worked at another printing company, North American Directory Corporation ("NADCO"). Historically, NADCO workers dominated the leadership roles of both locals, occupying virtually all of the officer and executive board positions. In June 1991, NADCO shut down its bindery, and in February 1993, it closed its plant altogether. NADCO's closing reduced Local 109C to roughly forty members -- about fifteen employed by Sullivan Brothers -- and Local 139B to just eight to ten members, all at Sullivan Brothers. The shutdowns also left the two locals largely without leadership. Following the 1991 bindery closing, Local 139B president Oscar Becht and secretary-treasurer Jeannette Pickels, both NADCO employees, were the only local officers or directors remaining in office, having obtained other jobs in the NADCO plant pending the 1993 shutdown date. Local 109C president Henry Boermeester, a NADCO pressman, announced at a membership meeting in 1992 that he would step down when the plant closed the following year. None of the few dozen remaining members of the two locals expressed interest in filling any of the leadership positions at either local. -3- 3 With membership at low levels -- the GCIU constitution permits the international to rescind a local's charter when membership dips below fifty -- Boermeester and Becht began to explore and discuss with their members the possibility of merging the two locals or transferring1 them to a larger local. The unwillingness of any remaining 109C and 139B members to assume leadership positions made merging the two locals impracticable.2 Thus, in January 1993, Local 109C members voted to surrender their charter and transfer to Local 600M, a GCIU local headquartered in Boston comprising about 700 workers in the printing industry. The administrative transfer became effective on July 1, 1993. Local 139B members followed suit in March, with the transfer effective on May 1, 1993. The two locals' assets, totalling about $15,000, were transferred to Local 600M with no ____________________ 1. Under the GCIU constitution and by-laws, two locals merge when both surrender their respective charters and negotiate a ____ new set of governing by-laws acceptable to the members of both merging locals. That document is then put to a secret ballot vote and, if approved, a new charter is issued to the new entity. An administrative transfer, on the other hand, occurs when one GCIU local surrenders its charter and its ___ members vote to join, and are accepted by, another GCIU local. The accepting local's charter and by-laws remain intact. 2. At the administrative hearing on the underlying complaint, Local 109C president Boermeester testified as follows: "Well, if they had merged together to form a Union, there still has to be somebody to lead the Union. Between the two groups or two units, there was still no leadership." -4- 4 condition that they be used for the benefit of the 109C or 139B members. -5- 5 B. Local 600M ______________ Since they had joined a sister GCIU local, the former 109C and 139B members were still subject to the International's constitution and by-laws. Local 600M's structure, constitution and by-laws, however, differ from those of former locals 109C and 139B in a number of ways: (1) Local 600M's territory extends well beyond the Lowell area, covering about forty shops throughout eastern Massachusetts and southern New Hampshire. Its trade jurisdiction is also greater: while approximately 500 of its 700 members work in the same classifications as the 139B and 109C members, Local 600M accepts all types of printing industry workers, including shipping clerks, truck drivers, and envelope and box manufacturers. (2) Local 600M dues are calculated on a sliding scale based on salary, rather than on a flat rate, as locals 109C and 139B calculated dues; thus, the pressmen would see their dues increase from $8 to $9.22 per week, while the bookbinders' dues would increase from $6 to $7.95.3 (3) Contract negotiation and ratification, as well as strike authorization, could also be different at ____________________ 3. Local 600M is not currently collecting dues from the former 109C and 139B members because of Sullivan Brothers' refusal to recognize it. -6- 6 Local 600M. As 109C and 139B members, the Sullivan Brothers bookbinders and pressmen were free to suggest contract terms for upcoming negotiations in informal "proposals meetings" held with their negotiators at a local donut shop or on the shop floor. A Local 600M by-law, however, requires members to submit proposed contract terms in writing to the president of the local at least ninety days before the contract expiration date. Another by-law gives the executive board the power to accept a contract against the wishes of a particular bargaining unit if the bargaining unit fails to approve the contract and at the same time fails to authorize, by a two-thirds majority, further action up to and including a strike. Locals 139B and 109C had no such by-law provisions. Local 600M by-laws also empower the executive board, on its own, to call a strike in unspecified "special cases" for any bargaining unit comprising fewer than twenty-five members -- a category that includes the Sullivan Brothers pressmen's and bookbinders' units. (4) Local 600M's by-laws impose a number of new work restrictions on the Sullivan Brothers pressmen and bookbinders. As members of Local 600M, they -7- 7 may not: solicit or accept work without union consent; perform trade work outside the shop where they are regularly employed without union permission; work for wages less than those provided for in the contract under which they are covered without union approval; work overtime contrary to executive board order; or take vacation other than as prescribed by their governing contracts absent executive board permission to take money instead of scheduled vacation time. (5) The leadership of Local 600M is almost entirely different from that of 109C and 139B. Of the defunct locals' two dozen officers and directors, only Boermeester assumed any kind of role in Local 600M (or even joined it). With the aid of Local 600M president George Carlsen, Boermeester obtained a seat on the local's executive board for the duration of a departing board member's term. Local 139B president Becht was offered a position on 600M's board and was asked to assist in upcoming contract negotiations with Sullivan Brothers, but he turned down the board position and made only a tentative commitment to the negotiations, depending upon his availability. In addition, Steven Wysocki, Local -8- 8 109C's "chapel chairman," or shop steward, at Sullivan Brothers, continued in the same capacity for the pressmen's unit of 600M. Boermeester and Wysocki, who along with another 109C officer had negotiated Local 109C's previous contracts with Sullivan Brothers, agreed to help Carlsen negotiate the next contract when the current contract expired in 1995. Boermeester already has negotiated contracts for the other two former 109C shops subsumed by 600M. C. The Current Dispute _______________________ On July 6, 1993, Local 600M formally notified Sullivan Brothers of the administrative transfers and asked the company to recognize and bargain with it as the exclusive representative of the former 109C and 139B members. The contract between 139B and Sullivan Brothers was due to expire on August 31, 1993; 109C's contract was effective through May 31, 1995. Local 600M proposed that Sullivan Brothers simply extend the 139B contract so that it expired contemporaneously with the 109C contract -- adjusting it in the interim for wage and benefit increases granted in 109C's most recent contract -- so that contracts (or possibly a single contract) could be negotiated for the two units at the same time. On August 11, 1993, Sullivan Brothers informed Local 600M that it did not consider itself bound by the transfer and refused -9- 9 to recognize Local 600M. In addition, beginning on July 1, 1993, Sullivan Brothers took unilateral actions that Local 600M alleges unlawfully altered some of the terms and conditions of employment in the bookbinders' and pressmen's units.4 Sullivan Brothers' refusal to recognize Local 600M prompted Local 600M to file an unfair labor practice charge with the NLRB on August 23, 1993. The Board issued an unfair labor practice complaint on October 28, 1993, subsequently amended on January 20, 1994, which charged Sullivan Brothers with violating sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. 158(a)(1) and (5), for refusing to bargain with Local 600M and for unilaterally changing the terms and conditions of employment. An administrative law judge ("ALJ") conducted a hearing on the matter on February 3 and 4, 1994.5 On March 7, 1994, more than six months after ____________________ 4. Sullivan Brothers: (1) ceased making contributions to the employees' pension plans; (2) announced a new 401(k) plan; (3) ceased deducting union dues and remitting them to the employees' bargaining representatives; (4) installed and began to use new equipment in the pressmen's unit; (5) granted wage increases to employees in the bookbinders' unit; (6) gave Christmas bonuses to employees in both units; and (7) implemented a proofreading bonus program for employees in both units. 5. On July 15, 1994, the ALJ issued his decision on the underlying complaint. The ALJ found that Local 600M was in fact the successor to Local 109C and that Sullivan Brothers had an obligation to bargain with it. The ALJ also found that Sullivan Brothers had no obligation to recognize Local 600M as Local 139B's successor because the vote to transfer violated minimal standards of due process. We accord the -10- 10 it initially received the union's complaint, and more than four months after it had issued its own complaint, the Board petitioned the district court for a temporary injunction pursuant to section 10(j) of the Act, 29 U.S.C. 160(j).6 The petition sought an order requiring Sullivan Brothers, pending final resolution of the issues raised in the underlying complaint, to recognize and bargain with Local 600M as the representative of the pressmen's and bookbinders' units, and to rescind, upon Local 600M's request, certain unilateral changes made in the terms and conditions of the members' employment. The district court found that "a question exists as to the continuity of representation ____________________ ALJ's decision, coming after the district court's ruling, "no independent weight in assessing whether the court erred," Maram v. Universidad Interamericana de Puerto Rico, 722 F.2d _____ __________________________________________ 953, 959 (1st Cir. 1983). Since the district court based its findings and conclusions on the administrative hearing record, we note that, to the extent it proves useful, "it is appropriate to look to evidence the ALJ points to that was before the court, but of which the court failed to take note." Id. ___ 6. Section 10(j) provides: The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper. -11- 11 provided by Local 600M" and that the Board had failed to establish a likelihood of success on the merits, and concluded that injunctive relief was not just and proper. This appeal followed. II. II. ___ The Section 10(j) Preliminary Injunction Standard The Section 10(j) Preliminary Injunction Standard _________________________________________________ In considering a petition for interim relief under section 10(j), a district court must limit its inquiry to whether (1) the Board has shown reasonable cause to believe that the defendant has committed the unlawful labor practices alleged, and (2) whether injunctive relief is, in the language of the statute, "just and proper." See Asseo v. ___ _____ Centro Medico del Turabo, 900 F.2d 445, 450 (1st Cir. 1990); _________________________ Asseo v. Pan American Grain Co., 805 F.2d 23, 25 (1st Cir. _____ _______________________ 1986); Maram v. Universidad Interamericana de Puerto Rico, _____ ____________________________________________ Inc., 722 F.2d 953, 958 (1st Cir. 1983). The district court ____ is not empowered to decide whether an unfair labor practice ___ actually occurred. Centro Medico del Turabo, 900 F.2d at _________________________ 450. In assessing whether the Board has shown reasonable cause, the district court need only find that the Board's position is "fairly supported by the evidence." Id. In ___ satisfying the court that injunctive relief is just and proper, however, the Board faces a much higher hurdle, for here the district court must examine "the whole panoply of discretionary issues with respect to granting preliminary -12- 12 relief." Centro Medico del Turabo, 900 F.2d at 454 (quoting ________________________ Universidad Interamericana de Puerto Rico, 722 F.2d at 958). __________________________________________ Thus, the district court must apply the familiar, four-part test for granting preliminary relief. Under this test, the Board must demonstrate: (1) A likelihood of success on the merits; (2) The potential for irreparable injury in the absence of relief; (3) That such injury outweighs any harm preliminary relief would inflict on the defendant; and (4) That preliminary relief is in the public interest. See, e.g., Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, ___ ____ _________________________ ________ 5 (1st Cir. 1991); Centro Medico del Turabo, 900 F.2d at 453. ________________________ When, as in this case, the interim relief sought by the Board "is essentially the final relief sought, the likelihood of success should be strong." Pan American Grain Co., 805 F.2d ______ ______________________ at 29 (emphasis added). Our review of the district court's analysis is limited. We review the court's determination of reasonable cause for clear error, and we examine its ultimate decision to grant or deny equitable relief for abuse of discretion. Centro Medico del Turabo, 900 F.2d at 450; Pan American Grain ________________________ __________________ Co., 805 F.2d at 25. A court abuses its discretion when, in ___ determining the likelihood of success on the merits, it applies an improper legal standard or erroneously applies the -13- 13 law to particular facts. Feinstein v. Space Ventures, Inc., _________ ____________________ 989 F.2d 49, 51 (1st Cir. 1993). III. III. ____ Discussion Discussion __________ The Board argues on appeal that the district court erred in concluding that the Board failed to demonstrate a likelihood of success on the merits and that it abused its discretion in denying its petition for injunctive relief. We now address these arguments. A. The District Court's Ruling A. The District Court's Ruling _______________________________ 1) Reasonable Cause ________________ The district court made no reasonable cause finding, instead proceeding directly to assess the Board's likelihood of success on the merits. Neither party argues that this in itself constituted error; we assume arguendo ________ that the district court did in fact find reasonable cause,7 ____________________ 7. Perhaps the court saw no reason to labor over a test of questionable utility; we are not unsympathetic. Even if a court makes an explicit finding that the Board had reasonable cause, it must still assess, as part of the "just and proper" determination, the relative likelihood that the Board will in fact ultimately prevail. See Centro Medico del Turabo, 900 ___ _________________________ F.2d at 455 ("[W]e are satisfied . . . that there is reasonable cause to believe that the alleged unfair labor practices were committed, and that there is substantial ___ likelihood of success") (emphasis added); Universidad ___________ Interamericana de Puerto Rico, 722 F.2d at 959 (stating that ______________________________ the reasonable cause determination consists of determining "whether the Regional Director's position was fairly supported and, if so, for the purpose of overall weighing, how likely so") (emphasis added). _____________ -14- 14 and turn to the district court's determination that the Board failed to demonstrate a likelihood of success. 2) No Likelihood of Success ________________________ The gravamen of the Board's unfair labor practice complaint is that the administrative transfer of Locals 109C and 139B to Local 600M raised no question of representation. In other words, the Board asserts that Local 600M took over the representation of the Sullivan Brothers bookbinders and pressmen from locals 139B and 109C with sufficient continuity to keep intact Sullivan Brothers' obligations to recognize and bargain with Local 600M and to perform under the existing collective bargaining agreements. The district court concluded that the Board had not demonstrated that it was likely to win that argument. In so holding, the district court relied primarily on (1) changes in leadership effected by the transfer; (2) changes in a number of the rights and ____________________ Two circuits have recently dropped the reasonable cause analysis in section 10(j) cases, reasoning that (1) it was erroneously introduced in section 10(j) cases by analogy to cases arising under section 10(l), which, unlike section 10(j), expressly requires that the Regional Director find reasonable cause prior to seeking an injunction, and (2) it is entirely superfluous, since determining that equitable relief is appropriate necessarily includes a finding that the Board is likely to succeed on the merits -- a virtual impossibility without also meeting the minimal reasonable cause standard. See Miller v. California Pacific Medical ___ ______ ___________________________ Center, 19 F.3d 449, 456-67 (9th Cir. 1994) (en banc); Kinney ______ ______ v. Pioneer Press, 881 F.2d 485, 487-93 (7th Cir. 1989). We _____________ find no fault in our sister circuits' rulings. However, the relative merits of retaining or discarding the reasonable cause requirement were not argued in this case, and we therefore decline to rule on the issue. -15- 15 duties of the local members; and (3) changes in the manner of negotiating, ratifying and administering contracts and calling strikes. The Board argues that these changes were non-existent, illusory, or insufficient to constitute a change in the representative's identity, and that the district court's conclusion was erroneous. We cannot say that any single one of the changes cited by the district court would result in a change of identity for a union, or even that, taken together, all of these changes will certainly result in an ultimate determination for Sullivan Brothers. Our task here is simply to determine whether the district court erred in finding significance in these facts and whether it abused its discretion in concluding that the Board had not demonstrated a clear likelihood of success. Bearing in mind that "[t]he ultimate question is whether the union . . . operates in substantially the same way as it did before," Seattle-First _____________ Nat'l Bank v.NLRB, 892 F.2d 792, 799 (9th Cir. 1989), cert. __________ ____ _____ denied, 496 U.S. 925 (1990), we think the district court ______ acted well within its discretion by declining to answer that question in the affirmative. To determine whether a particular affiliation, merger, or transfer interrupts an existing collective bargaining relationship, the Board asks: (1) whether the merger or transfer vote occurred under "circumstances -16- 16 satisfying minimum due process"8 and (2) whether there was "substantial continuity" between the pre- and post-merger union.9 Southwick Group d/b/a Toyota of Berkeley, 306 ____________________________________________ N.L.R.B. 893, 899 (1992) (quoting News/Sun-Sentinel Company, _________________________ 290 N.L.R.B. 1171 (1988), enforced 890 F.2d 430 (D.C. Cir. ________ 1989), cert. denied, 497 U.S. 1003 (1990)); see also _____ ______ ___ ____ Insulfab, 789 F.2d at 965. ________ The "substantial continuity" prong is a fact- intensive test that compares the pre- and post-merger labor organizations and asks "whether the changes are so great that a new organization has come into being -- one that should be required to establish its status as a bargaining representative through the same means that any labor organization is required to use in the first instance." Toyota of Berkeley, 306 N.L.R.B. at 900. No single factor is __________________ determinative, nor is a particular checklist prescribed. ____________________ 8. Sullivan Brothers apparently does not challenge the procedures surrounding Local 109C's and Local 139B's transfer votes in this proceeding, and we therefore offer no opinion on whether those votes satisfied minimal due process standards. See supra note 5. _____ 9. Union affiliations and mergers do not necessarily, or even usually, raise a question of representation. NLRB v. ____ Insulfab Plastics, Inc., 789 F.2d 961, 964 (1st Cir. 1986). _______________________ A question of representation arises when the affiliating union undergoes changes "sufficiently dramatic to alter the union's identity." Id. at 964-65. Otherwise, affiliation ___ "is an internal union matter that does not affect the representative status of the bargaining agent or end the employer's duty to continue its relationship with that union." Id. at 965. ___ -17- 17 Rather, "[t]he Board considers the totality of a situation." Id. Among the factors that the Board has traditionally ___ considered are: "the continued leadership responsibilities of existing union officials, the perpetuation of membership rights and duties, the continuance of the manner in which contract negotiations, administration, and grievance processing are effectuated, and the preservation of the certified representative's assets, books and physical facilities." Id. See also Insulfab, 789 F.2d at 965 ___ ___ ____ ________ (listing as factors to consider "structure, administration, officers, assets, membership, autonomy, by-laws, size" (quoting NLRB v. Pearl Bookbinding, 517 F.2d 1108, 1111-12 ____ __________________ (1st Cir. 1975)); J. Ray McDermott & Co. v. NLRB, 571 F.2d _______________________ ____ 850, 857 (5th Cir.) ("we must consider whether changes have occurred in the rights and obligations of the union's leadership and membership, and in the relationships between the putative bargaining agent, its affiliate, and the employer"), cert. denied, 439 U.S. 893 (1978). _____ ______ The Board argues that the district court erred in performing the substantial continuity analysis by exaggerating and overemphasizing changes in leadership while ignoring other evidence of continuity. We recognize that "there is no requirement that officers of a merged local must become officers of the new local," Service America Corp., 307 ________ _____________________ N.L.R.B. 57, 60 (1992) (emphasis added), and that continued -18- 18 leadership may be provided by representatives other than union officers if they fill positions of responsibility and trust. As evidence of continuity of leadership, the Board points to the continuation of Wysocki in his role as shop steward, former Local 139B president Becht's tentative commitment to participate in future negotiations, and former Local 109C president Boermeester's election to Local 600M's executive board and his continued participation in contract administration and negotiation. The evidence, however, supports a finding that the transfer did in fact change the relationship between the putative bargaining agent and Sullivan Brothers. Becht's tentative commitment remained just that, and Boermeester failed to obtain as a condition of the transfer an express guarantee that he would oversee day-to-day contract administration and future negotiations with Sullivan Brothers. Moreover, Boermeester's term on the executive board expires at the end of 1994, when he must face reelection before the entire local. Furthermore, Local 600M president Carlsen notified Sullivan Brothers in writing following the transfers that henceforth it would be his ___ office that would handle contract administration, negotiations, and grievances, and that future communications concerning those matters should be directed accordingly. Compare Toyota of Berkeley, 306 N.L.R.B. at 904 (finding _______ ___________________ -19- 19 substantial continuity following merger where, inter alia, _____ ____ former union's principal official, as a condition of the merger, "continued to exercise sole control over the collective bargaining and day-to-day contract administration and grievance handling on behalf of employees formerly represented by [the merged] Local"). In arguing that there was in fact continuity of leadership, the Board relies heavily on Service America. We ________________ fail to see how that case controls here. In Service America, _______________ the Board held that having new representatives negotiate and administer contracts following a merger does not necessarily defeat continuity, particularly when the former union would have undergone a change in leadership anyway. Service _______ America, 307 N.L.R.B. at 60. The circumstances in that case _______ were entirely different, however, from the case at hand. First, the merging union in that case, Local 513, still had 1,300 members and a full slate of its own local leaders when it merged with Local 115. Here, the evidence is undisputed that no members of Local 139B or 109C wished to take over __ positions of leadership within their own locals; the transfer occurred in part precisely because the workers had no more leaders and no prospects of finding any among the ranks -- i.e., they had no more representation. Second, in Service ______________ _______ America, both of Local 513's top officials also served as _______ business agents negotiating contracts and handling grievances -20- 20 for the union; they continued as full-time business agents, negotiating contracts and handling grievances, for Local 115. No former 109C or 139B officer has retained a similar position of responsibility as part of Local 600M. Wysocki's continued stewardship and Boermeester's position on Local 600M's executive board represent some continuity of ____ leadership for their former local; whether they represent substantial continuity is doubtful. Our attention has not ___________ been directed to any case in which the Board ultimately found substantial continuity when the affiliating or merging union has undergone the kind of transformation of leadership seen here. See Garlock Equip. Co., 288 N.L.R.B. 247-253 (1988) ___ ___________________ ("[T]he cases have placed emphasis upon whether unit employees have continued to be represented by the same officers operating under the same procedures and with the same degree of autonomy as before the change."). A host of other factors further distinguishes this case from Service America. In that case, the dues structure _______________ remained virtually identical following the merger, contract ratification and strike vote procedures were similar, and some of Local 513's assets were retained for the benefit of its members. Here, the district court found significant a number of changes in the structure of the union, in the bookbinders' and pressmen's rights and duties as members, and -21- 21 in the procedures for contract negotiation, ratification and strike votes.10 The Board contends that the district court erred in assigning importance to these changes -- particularly those concerning contract ratification and strike votes, which may be apparent in Local 600M's by-laws but might never be put into practice. We recognize that actual union practice, and not just the letter of the by-laws, controls. Central _______ Washington Hosp., 303 N.L.R.B. 404, 405 (1991); Seattle-First ________________ _____________ Nat'l Bank, 892 F.2d at 799. In both of those cases, __________ however, there was testimony that union practice was actually contrary to the by-laws in question. Here, Carlsen testified that Local 600M's by-laws in fact permit the executive board to accept a contract against the wishes of the majority of a bargaining unit's members. The record contains no evidence that that particular provision, or any other provision in question, does not represent the actual practice of Local ___ 600M. As we have stated previously, interim relief in section 10(j) cases is not normally appropriate unless it is clear that ultimate success for the Board will "not prove ____________________ 10. For a more complete description of these changes, see supra part I.B. The district court made no finding regarding _____ the preservation of former Local 109C's and 139B's assets. The evidence was undisputed, however, that the assets were not preserved for the use of the former members but instead were or would be added to Local 600M's general or emergency funds. -22- 22 difficult." Pan American Grain Co., 805 F.2d at 29. From _______________________ our perspective, however, the transfer of locals 139B and 109C to 600M exhibited no combination of characteristics on which the Board has typically based a finding of continuity in the past. Cf., e.g., Service America, 307 N.L.R.B. 57 ___ ____ _______________ (1992) (finding continuity where merger resulted in positions of significant responsibility for former leaders, virtually identical rights, responsibilities and dues for members, and preservation of certain assets for benefit of former members); Toyota of Berkeley, 306 N.L.R.B. 893 (1992) ____________________ (finding continuity where former local was merged into sister local as separate, autonomous division with same trade and geographic jurisdiction; identical principal official and bargaining agent; identical authority of bargaining agent and members to negotiate and administer contracts, fashion bargaining proposals, and call strikes; virtually identical dues structure; and where by-laws of sister local were amended as a condition of the merger); May Dep't Stores Co., ____________________ 289 N.L.R.B. 661 (1988) (finding continuity where leadership, authority, dues, and rights and duties of members remained intact following merger of four locals into one local with four administrative districts), aff'd, 897 F.2d 221 (7th _____ Cir.), cert. denied, 498 U.S. 895 (1990). Without some Board _____ ______ precedent finding continuity where the changes at least approach those seen here, we cannot say that the district -23- 23 court incorrectly applied the law in concluding that the Board had not shown a likelihood of success. The district court did not analyze the Board's petition under the remaining three requirements for injunctive relief, and we see no need to engage in that exercise here. Without a clear likelihood of success, injunctive relief would not have been just and proper. See ___ Weaver v. Henderson, 984 F.2d 11,12 (1st Cir. 1993) ("The ______ _________ sine qua non of [the injunctive relief analysis] is whether ____________ the plaintiffs are likely to succeed on the merits."); see ___ also Pan American Grain Co., 805 F.2d at 28 (stating that for ____ ______________________ an injunction to issue, the record must support a finding of a likelihood of success on the merits). Thus, the district court's denial of injunctive relief was not an abuse of discretion. AFFIRMED. AFFIRMED. -24- 24