MJM Productions v. Kelley Productions CV-03-390-JD  09/24/03 P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>MJM Productions, et al.</u>

   v.                                Civil No. 03-390-JD
                                         Opinion No. 2003 DNH 159
<u>Kelley Productions, Inc., et al.</u>


O R D E R


The plaintiffs, MJM Productions ("MJM"), Michael J. MacLeod, and Jefferson Dutton have produced a film called <u>Brotherhood</u>, which is set in a small town in New Hampshire.  They bring suit against Kelley Productions, Inc. ("KPI"), CBS Broadcasting, Inc. ("CBS"), and Twentieth Century Fox Film Corporation ("Fox"), alleging that the defendants' television series, *The Brotherhood of Poland, New Hampshire*, constitutes unfair competition and infringes their trademark rights in <u>Brotherhood</u>.  The plaintiffs seek a preliminary injunction with certain restraints against the defendants' use of "Brotherhood," including an injunction against the broadcast of *The Brotherhood of Poland, New Hampshire*, in New Hampshire.  The series is scheduled to premiere nationwide on September 24, 2003.  The court held a hearing on the plaintiffs' motion on September 22, 2003.

<u>Background</u>

The court makes the following preliminary findings of fact based on the evidentiary materials submitted by the parties and the representations of counsel at the motion hearing. <u>See</u> Fed. R. Civ. P. 52(a); <u>TEC Eng'g Corp. v. Budget Molders Supply, Inc.</u>, 82 F.3d 542, 544 (1st Cir. 1996).

A.    <u>The Plaintiffs' Perspective</u>

The following facts are drawn from MacLeod's affidavit, submitted in connection with the motion for preliminary injunction.[1]  The plaintiffs' film was born in March 2002, when MacLeod and Dutton began to develop the idea for a story about a group of friends returning from college to a small town in New Hampshire.  MacLeod owns defendant MJM, a film production and location scouting company in Manchester, New Hampshire.  Dutton studies film at a college in upstate New York.

MacLeod and Dutton began writing the film in April of 2002. The screenplay focused on five male characters, with the action centered around an actual diner in Derry, New Hampshire. Shooting took place between June 24, 2002, and July 15, 2002, at

---

[1]The defendants have filed an objection to a number of the statements in MacLeod's affidavit on evidentiary grounds.  For reasons which will appear, the resolution of this objection is not material to the outcome of the plaintiffs' motion.

2

in-state locations, including the diner.  The film premiered in a private showing at the same diner on August 9, 2002.

MJM later submitted copies or synopses of the screenplay to "several major motion picture and television studios."  Warner Brothers apparently expressed interest, asking for a copy of the screenplay for consideration as a motion picture, reviews of the film published by college students, and a script for a television version of the film.  At Warner Brothers' direction, MJM screened the film in a theater at Brandeis University in Massachusetts on December 3, 2003, receiving a "very positive" audience reaction. MacLeod also claims that "[t]he film was discussed with Fox Los Angeles," although he does not relate the participants, content, time, or place of these discussions.

The film also drew the attention of local media.  A Manchester radio station interviewed Dutton and MacLeod about the film in June 2002.  Another interview was broadcast on the Derry television station WNDS in early July 2002, and an article about the film appeared in The Derry News and The New England Entertainment Digest around the same time.  In late November 2002, WNDS aired another interview with MacLeod and Dutton, which included a synopsis of and clips from the finished film. Following the screening at Brandeis, The New England Entertainment Digest ran another article about the film, which

"contained many positive comments."  MacLeod claims that he and his company "invested almost all our time, efforts and money in developing, creating, filming, publicizing and marketing the film" between early 2002 and spring 2003.  Apart from the facts already set forth, however, MacLeod's affidavit does not describe any of these efforts, how much they cost, or their degree of success.  The plaintiffs' counsel conceded at the hearing that Brotherhood has never been shown to a paying audience in New Hampshire.  It is not clear whether the attendees at the Brandeis screening were charged admission.

MacLeod's affidavit is also unclear as to when the plaintiffs began calling their film Brotherhood.  Although he uses the name to refer to the plaintiffs' film as it existed throughout its development, he also relates that as late as July 2002, the film was "tentatively titled The Town of Brotherhood."  No other evidence on this point was submitted.  The court finds that the plaintiffs did not begin calling their film The Town of Brotherhood until July 2002, and did not use the title Brotherhood until they first screened the film on August 9, 2002.

In February 2003, a WNDS reporter called MacLeod to congratulate him, believing he had sold Brotherhood to be released as David E. Kelley's The Brotherhood of Poland, New Hampshire.  That was the first time MacLeod heard of The

4

*Brotherhood of Poland, New Hampshire*.  Later that month, MacLeod claims to have called KPI and "asked them to change the name of their television series," only to be rebuffed by Veronica Wilson, KPI's vice president of legal affairs.[2]  Beginning with a letter from MJM's attorneys to KPI on April 11, 2003, counsel for MJM and KPI engaged in acerbic correspondence about the use of "Brotherhood" in the title of KPI's series and the degree of similarity between its content and that of MJM's film.  MJM's lawyers threatened suit in a letter to CBS' general counsel on June 11, 2003.  They also offered to forebear from filing an action until June 25, 2003.

When that day arrived, however, KPI, Fox, and CBS brought a declaratory judgment action in the United States District Court for the Central District of California, challenging MJM's and MacLeod's claim to trademark rights in "Brotherhood."  MJM and MacLeod filed a motion to dismiss or transfer that case to New Hampshire on the basis of lack of personal jurisdiction on July 28, 2003.  On August 25, 2003, the court in California granted the ex parte application of the plaintiffs for discovery on the

---

[2]Wilson remembers her conversation with MacLeod differently. She relates that he simply "asked if there might be any conflicts" between MJM's Brotherhood and KPI's series, and wished her "good luck with [KPI's] project" at the end of the conversation.  The resolution of these competing versions of the call, however, is not material to the outcome of this motion.

jurisdictional issue and scheduled a hearing on the pending motion for November 17, 2003. Because the hearing was to take place after *The Brotherhood of Poland, New Hampshire* was to debut, MJM, MacLeod, and Dutton filed this action on September 10, 2003, together with a motion for a preliminary injunction.

B.    The Defendants' Perspective

The defendants offer a different backstory to this litigation. Kelley, the chief executive officer of KPI and the creator of a number of previous television series, wrote the script which became the pilot episode of *The Brotherhood of Poland, New Hampshire* in 2002. At that time, he had never heard of any of the plaintiffs or their Brotherhood project. KPI later reached an agreement with Fox to distribute the series. On January 17, 2003, Fox registered the pilot with the United States Copyright Office under the name *The Brotherhood of Poland, New Hampshire*. Fox claims to have no record of any feature film entitled Brotherhood which was submitted for its consideration as of April 2003 or, for that matter, any feature film submission which involved any of the plaintiffs.

In February 2003, Fox ordered a "trademark and title search" of the title *The Brotherhood of Poland, New Hampshire*. The search revealed no existing films or television series with the

same name, but turned up more than fifty works with the word "Brotherhood" in the title. Fox's April 17, 2003, search of the Internet Movie Database, <*www.imdb.com*>, revealed fifteen films, eight made-for-TV movies, and four straight-to-video releases whose titles included the word "Brotherhood." On the same day, Amazon.com was offering for sale 422 books, 10 DVDs, and 24 videos containing "Brotherhood" in their titles. The Filmtracker/Baseline database, a storehouse of information on film and television development, listed 27 projects whose titles included "Brotherhood" as of April 21, 2003. At this preliminary stage in the proceedings, the court finds the foregoing evidence--which was received without objection from the plaintiffs--sufficiently reliable to demonstrate the widespread use of the word Brotherhood" as an artistic or literary title.

The series, which the defendants plan to broadcast on CBS, "focuses on the family and career challenges of three middle-aged brothers in the fictional town of Poland, New Hampshire." Aside from a portion of the pilot episode shot in the real New Hampshire town of Plymouth, the entire series to date has been filmed in California.[3]

_____

[3]During the war of words which preceded the litigation, the plaintiffs claimed further similarities between the content of their film and that of *The Brotherhood of Poland, New Hampshire* in that the series is to contain scenes shot in a diner and

CBS claims to have spent "well in excess of $10 million" to date promoting *The Brotherhood of Poland, New Hampshire*. This sum paid for on-air promotions, national print ads, local radio and cable spots, and billboards and other outdoor print media, all of which "prominently featured the title . . . in an effort to make the name memorable and synonymous with the [p]rogram." Accordingly, the defendants contend that they cannot change the name at this late date without losing viewers. CBS also contends that the sole means of stopping the program from airing in New Hampshire is to pull it from its affiliates in Boston, Massachusetts, Burlington, Vermont, and Portland, Maine, each of which broadcasts into part of New Hampshire. This would cause more than 2.5 million viewers outside of New Hampshire to miss the show as well, imperiling the ratings guarantees which CBS has made to its advertisers in connection with the premiere. CBS expects the premiere alone to generate $1.3 million in revenue.

---

feature flashbacks to the college days of the middle-aged characters. The plaintiffs offered no competent evidence on this point in connection with their motion, however. More importantly, the Supreme Court has made clear that the Lanham Act does not protect "any idea, concept, or communication" embodied in a film, but merely the film itself as a tangible good. See Dastar Corp. v. Twentieth Century Fox Film Corp., 123 S. Ct. 2041, 2050 (2003). Accordingly, the asserted similarities between the content of the plaintiffs' and defendants' works does not inform the court's analysis of the plaintiff's claim.

<u>Standard of Review</u>

A court must consider four factors when determining whether to issue a preliminary injunction: (i) the plaintiff's likelihood of success on the merits; (ii) whether the plaintiff risks suffering irreparable harm if the injunction is not granted; (iii) whether such injury outweighs the harm that injunctive relief would cause for the defendant; and (iv) whether the public interest would be adversely affected by granting or denying the injunction. <u>See</u> <u>Am. Bd. of Psychiatry & Neurology, Inc. v. Johnson-Powell</u>, 129 F.3d 1, 3 (1st Cir. 1997). "In the trademark context, 'irreparable harm may be shown even in the absence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim.'" <u>I.P. Lund Trading ApS v. Kohler Co.</u>, 163 F.3d 27, 33 (1st Cir. 1998) (quoting <u>Calamari Fisheries, Inc. v. Village Catch, Inc.</u>, 698 F. Supp. 994, 1013 (D. Mass. 1988)). The key issue, therefore, is the plaintiffs' likelihood of success on the merits. <u>See</u> <u>New Comm Wireless Servs. v. Sprintcom, Inc.</u>, 287 F.3d 1, 8 (1st Cir. 2002).

<u>Discussion</u>

The plaintiffs' complaint asserts claims against the defendants for (1) trademark infringement, (2) false designation

9

of origin under section 43(a) the Lanham Act, 15 U.S.C. § 1125(a), (3) violation of New Hampshire Revised Statutes Annotated 358:A, which prohibits unfair or deceptive trade practices, (4) conversion, and (5) unjust enrichment. In their memorandum in support of their motion for preliminary injunction, however, the plaintiffs elected to proceed solely on the basis of their trademark claim under the Lanham Act. The court's analysis of the plaintiffs' motion is therefore limited to that ground.

The plaintiffs seek alternative forms of injunctive relief. They ask the court either to prohibit the defendants from broadcasting their program in New Hampshire under its current title, or to require them to air the show (and any future television advertising of it) in New Hampshire only with a written disclaimer that it is "not affiliated with or sponsored by the film <u>Brotherhood</u> produced by MJM Productions of Manchester, New Hampshire." The plaintiffs do not contend that the name "Brotherhood" has achieved distinctiveness outside of New Hampshire, or that *The Brotherhood of Poland, New Hampshire* will be confused with their film outside of New Hampshire.

The defendants object on a number of grounds. First, they criticize the plaintiffs for waiting until the eleventh hour to enjoin the broadcast, despite having known about *The Brotherhood of Poland, New Hampshire* since February 2003. Second, they

10

dispute that the plaintiffs have shown a likelihood of success on their trademark claim, because their mark is neither distinctive nor is their film likely to be confused with the defendants' series.  Finally, the defendants contend that the balance of harms tips in their favor, given their investment in promoting the series to premiere under its current name.[4]

A.   The Plaintiffs' Delay in Seeking Injunctive Relief

In deciding whether to issue an injunction, a court may take into account the movant's delay in seeking injunctive relief. See SMA Life Assurance Co. v. Sanchez-Pica, 960 F.2d 274, 277-28 (1st Cir. 1992); 13 James Wm. Moore *et al.*, Moore's Federal Practice § 65.06[5][b] (2003).  The plaintiffs admit to learning of the existence of *The Brotherhood of Poland, New Hampshire* in February 2003, more than six months before they brought this action to enjoin the program on September 10, 2003.  The defendants imply that the plaintiffs have intentionally tried to gain an unfair advantage by waiting until just sixteen days

_____

[4]The defendants also moved to transfer this case to the Central District of California to be consolidated with the litigation pending there, or to stay this action until the California case is resolved.  At the hearing on the preliminary injunction, the court ruled that it would take up the merits of the defendants' motion after considering the plaintiffs' application for injunctive relief, and after the plaintiffs had an opportunity to respond to the defendants' motion.

11

before the scheduled premiere of the series to seek an injunction.  The plaintiffs explain that they were initially held up by their efforts to resolve the dispute without litigation, as presumably reflected by their lawyers' letters to the defendants during the late spring of 2003.  The plaintiffs attribute their inaction over the summer to the defendants' tactic of bringing suit against them in California and then delaying the resolution of their personal jurisdiction defense.  Under these circumstances, the plaintiffs contend that their motion for a preliminary injunction was timely, brought shortly after it became clear that their motion to dismiss the California action for lack of personal jurisdiction would not be heard until after the program debuted.

The defendants' objection to the last-minute effort by the plaintiffs to enjoin the showing of *The Brotherhood of Poland, New Hampshire* as scheduled is well-taken.  Indeed, the plaintiffs' proffered justification--that they expected their motion to dismiss the California action to be decided in advance of the show's premiere--makes little sense.  First, their position assumes that their motion to dismiss or transfer the litigation would have been granted.[5]  Second, the dismissal of

---

[5]Naturally, this court expresses no opinion on the merits of the jurisdictional issue raised in the California action.

12

the California case for lack of personal jurisdiction would have done nothing to resolve the merits of the plaintiffs' infringement claim and therefore posed no obstacle to the defendants' proceeding with the broadcast as scheduled. In short, the pendency of the California action should not have factored heavily into the plaintiffs' decision to abstain from seeking to enjoin the premiere of the defendants' program in a more timely fashion. The court is therefore left to conclude that the timing of the plaintiffs' request for injunctive relief was primarily the product of tactical, rather than practical, considerations. Nevertheless, the court does not find the plaintiffs' delay in pursuing relief in this court, in and of itself, sufficient grounds to deny the injunction.

B. The Plaintiffs' Likelihood of Success on The Merits

In the First Circuit, a preliminary injunction cannot issue absent the movant's "clear likelihood of success" on the merits of its claim. Pye ex rel. NLRB v. Sullivan Bros. Printers, Inc., 38 F.3d 58, 67 (1st Cir. 1994). The parties are in agreement that, in order to prevail on their claim under section 43(a) of the Lanham Act, the plaintiffs must prove both that (1) "Brotherhood" has acquired a distinctiveness sufficient to qualify it for trademark protection, and (2) the defendants' use

13

of *The Brotherhood of Poland, New Hampshire* as a title causes a likelihood of confusion between the sources of their show and the plaintiffs' film.  See 15 U.S.C. § 1125(a); Chrysler Corp. v. Silva, 118 F.3d 56, 58 (1st Cir. 1997).

        1. The distinctiveness of the plaintiffs' mark.

The plaintiffs concede that, because Brotherhood is the title of a single literary work, they can prove distinctiveness solely on the basis of secondary meaning (as opposed to showing that the title is arbitrary, fanciful, or suggestive).  See Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1379 n. 4 (2d Cir. 1993); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 10:2 (4th ed. 2003).  In order for a literary title to have secondary meaning, consumers must associate it with a particular source, but need not know the identity of the source itself.  See 2 McCarthy § 10:10.

"'Proof of secondary meaning entails vigorous evidentiary requirements.'"  Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990)).  A party may fulfill these requirements through either direct or circumstantial evidence.  See Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25 (1st Cir. 2001).  Consumer

14

surveys are the only form of direct evidence of a mark's secondary meaning which courts have generally accepted. See Boston Beer, 9 F.3d at 182. Indeed, "[c]ustomer survey evidence, while not required, is a valuable method of showing secondary meaning." I.P. Lund, 163 F.3d at 42.

The plaintiffs have not come forward with proof of any consumer survey attesting to a public association between the title Brotherhood and any single source. Instead, they have submitted affidavits from thirty-two people who claim to be "familiar with the film 'Brotherhood' which was written by Jefferson Dutton and produced by Michael MacLeod and MJM" and to have "associated the movie title 'Brotherhood' with [the plaintiffs] and not with any other company or person." The court finds these affidavits wanting in several respects as direct evidence of secondary meaning.

As an initial matter, the individual statements of a select group of individuals do not constitute the kind of survey evidence which courts have traditionally found probative of a mark's secondary meaning. Cf. President & Trs. of Colby Coll. v. Colby Coll.-N.H., 508 F.2d 804, 809 (1st Cir. 1975) (testimony of "experienced surveyor" who polled "representative cross-section

of the population," consisting of 500 people each from Maine, New Hampshire, and metropolitan Boston, accepted as evidence of secondary meaning in New England); 2 McCarthy § 15:42 ("To be effective, a survey must be carefully conducted by an expert survey director . . . [Q]uestions to be asked in the survey must be carefully phrased so as to elicit honest and unprompted consumer reaction . . . ").

Here, the plaintiffs have provided no explanation whatsoever as to how the affidavits were procured, including how the affiants were selected from the consuming public or what questions were asked of them. Moreover, in the absence of any expert testimony to the contrary, the court cannot accept the views of thirty-two people (five of whom do not even reside in New Hampshire) as reflecting the secondary meaning of the plaintiff's mark across the state. Finally, the conclusory nature of the statements in the affidavits, the similarity of each affiants' testimony to that of the others, and the fact that many of the witnesses claim to have spoken with one of the plaintiffs before swearing out the affidavit casts further doubt on their evidentiary value. The court finds the affidavits to constitute unpersuasive evidence of secondary meaning.

Although consumer survey evidence is valuable, it has never been treated as a "sine qua non" of secondary meaning in the First Circuit. I.P. Lund, 163 F.3d at 42. Secondary meaning may also be proven through circumstantial evidence. The circuit has endorsed a number of factors to be considered in assessing circumstantial proof of a mark's secondary meaning. They include: (1) the length and manner of the mark's use, (2) the nature and extent of its advertising and promotion, (3) the efforts made to promote a conscious connection between the mark and the product's source, (4) the product's established place in the market, and (5) proof of the defendant's intentional copying of the mark. See Yankee Candle, 259 F.3d at 43-44. The list of factors is not intended to foreclose other means of proving secondary meaning. See I.P. Lund, 163 F.3d at 41. In addition, a party need not prove the existence of each factor in order to prevail on a showing of secondary meaning. See id.

The plaintiffs argue that, because they have proven that the defendants intentionally copied the title of the film, the burden shifts to the defendants to prove that Brotherhood lacks secondary meaning. For this proposition, the plaintiffs rely on Yankee Candle, 259 F.3d at 38. In that case, however, the First

17

Circuit listed "proof of intentional copying" among the factors to be considered in evaluating secondary meaning, rather than assigning it any special weight. Id. at 44. Moreover, the court expressly found that the plaintiff's evidence of intentional copying was *not* probative of secondary meaning, despite evidence that the defendant's designers were told to make their wares look more like the plaintiffs'. See id. Accordingly, Yankee Candle does not appear to adopt the minority view that evidence of copying triggers a presumption of secondary meaning. See 2 McCarthy § 15:38.

In any event, the plaintiffs' argument depends on a factual premise wholly unsupported by the evidence. The plaintiffs invite this court to infer that the defendants intentionally copied the title Brotherhood from the fact that the defendants refused to rename *The Brotherhood of Poland, New Hampshire* as demanded by the plaintiffs. The court declines to make that inference. The argument that the defendants acted wrongfully by refusing to scrap their title on the asserted strength of the plaintiffs' mark presumes exactly what is at issue in this litigation. Furthermore, the evidence submitted by the defendants demonstrates that (1) Kelley had never heard of the

18

plaintiffs or their film before April 2003, long after the pilot had been registered with the copyright office as *The Brotherhood of Poland, New Hampshire*, (2) Fox has no record of having received anything concerning the plaintiffs' film, and (3) Fox performed due diligence in August 2003 which failed to reveal the existence of <u>Brotherhood</u>. The court finds no evidence that the defendants intentionally copied the plaintiffs' mark.

The plaintiffs also argue that the "length and exclusivity" of their use of <u>Brotherhood</u>, their efforts to market and promote the film, and the media attention it has received point in the direction of the title's secondary meaning. The court disagrees. First, MacLeod's affidavit establishes that the plaintiffs have been using the word "Brotherhood" in their film's title since July 2002 at the earliest. Thus, no more than six months had elapsed between the plaintiffs' use of the mark and Kelley's registration of *The Brotherhood of Poland, New Hampshire* with the copyright office. In addition, the plaintiffs' use of "Brotherhood" was in no way exclusive, given the number of pre-existing films, television programs, and other media which also used the word in their titles. The court finds that the factor of the length and exclusivity of the plaintiffs' use of their

19

mark does not weigh in favor of a finding of secondary meaning.

The court also finds that the plaintiffs' promotional and marketing efforts do not suffice to establish secondary meaning. The plaintiffs argue, in essence, that due to their limited resources they should face a lower threshold in making out this factor. Regardless of the merit of this contention as an equitable matter, the plaintiffs simply have not provided enough proof of their endeavors in promoting and marketing their film. MacLeod himself states that his efforts in this regard were limited to just over one year's time, between early 2002 and spring 2003.[6] They also appear to have been limited to screening the film twice (once outside of New Hampshire) and attempting to interest film and television studios in a largely unspecified way. Indeed, MacLeod does not describe his efforts with any particularity, making it impossible to gauge their intensity.

Most significantly, the plaintiffs concede that nobody has ever paid to see their film, at least in New Hampshire. Although some courts and commentators have recognized that pre-sales

_____

[6]The plaintiffs argue that this period should be deemed sufficient because MacLeod gave up on trying to promote their film only after learning of the defendants' production. Again, this argument presumes what is at issue in this litigation, i.e., that the defendants were wrongfully using the word "Brotherhood" in the title of their series.

20

publicity can suffice to create secondary meaning even before a product has actually been sold, the evidence does not support such a theory here. Cf. 2 McCarthy § 15:57. Based on this evidence, the court concludes that the plaintiffs' marketing and promotional efforts have not lent secondary meaning to the title Brotherhood.

The plaintiffs suffer from a similar evidentiary deficiency with regard to their argument that Brotherhood has accumulated secondary meaning through the unsolicited media attention the film has received. Indeed, while MacLeod lists a number of stories about the film which have run in the local media, the plaintiffs have not supplied any of those news articles, or transcripts of the radio or television interviews. Accordingly, it is impossible to determine whether any of these stories (save that which referred to the film as "tentatively titled The Town of Brotherhood") even referred to the film by its title. In addition, the plaintiffs have not presented any information, such as circulation or audience statistics, which would enable the court to determine whether these stories reached enough consumers to create secondary meaning throughout the state. The court finds that the plaintiffs' evidence of "unsolicited media

21

attention" does not establish secondary meaning.

Accordingly, the court finds that the plaintiffs have failed to carry their burden to show a secondary meaning attributable to the title Brotherhood.  Based on the evidence presented in connection with the preliminary injunction motion, the court rules that the likelihood of success on the merits of the plaintiffs' Lanham Act claim is highly improbable.


## 2. Likelihood of consumer confusion

Having found that the plaintiffs' mark was "not entitled to trademark protection because [it has] not attained secondary meaning, . . .  the court [does] not need to address the question of likelihood of confusion."  Boston Beer, 9 F.3d at 183. Nevertheless, the court also finds that there is little likelihood of confusion between the plaintiffs' film title and the name of the defendants' television series, based largely upon the findings already set forth.

The First Circuit has listed eight factors to be weighed in considering likelihood of confusion, including:  (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the

relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendants' intent in adopting their mark; and (8) the strength of the plaintiffs' mark. See Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989). Other than the apparent similarity of the marks, none of these factors appears to weigh in the plaintiffs' favor. A nationally broadcast television program and a film which has been shown only twice cannot be said to be similar goods, share channels of trade, or target the same classes of purchasers. The defendants have advertised their film through a number of national media channels, while the plaintiffs provide no evidence of how they have advertised their film (if at all). Finally, for the reasons set forth in the court's analysis of secondary meaning, it is clear that there is virtually no probative evidence of actual confusion or actual copying, and that the plaintiffs' mark is weak. Accordingly, the court finds that the plaintiffs have failed to shoulder their burden of showing a likelihood of confusion.

## Conclusion

Based on the foregoing, the plaintiffs' motion for preliminary injunction (document no. 3) is DENIED for failure to show a likelihood of success on the merits of their Lanham Act claim.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

September 24, 2003

cc:   Irvin D. Gordon, Esquire
      Mark Schonfeld, Esquire
      Cameron G. Shilling, Esquire
      Adam J. Thurston, Esquire
      Rodney F. Page, Esquire