The **YANKEE CANDLE COMPANY, INC.,** Plaintiff, Appellant,

v.

The **BRIDGEWATER CANDLE COMPANY, LLC,** Defendant, Appellee.

No. 00–2472.

United States Court of Appeals, First Circuit.

Heard May 11, 2001.

Decided Aug. 6, 2001.

Gregory L. Baker, with whom Colin Foley, Howrey Simon Arnold & White, Cecil E. Key, Jr., and Brobeck, Phleger & Harrison, were on brief, for appellant.

Michael A. Albert, with whom Ilan D. Barzilay, Wolf, Greenfield & Sacks, P.C., Richard J. Moose and Dority & Manning, P.A., were on brief, for appellee.

Before BOUDIN, Chief Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

TORRUELLA, Circuit Judge.

Yankee Candle Company ("Yankee"), a leading manufacturer of scented candles, sued competitor Bridgewater Candle Company ("Bridgewater") on counts of copyright infringement and trade dress infringement under federal law, as well as on state claims of common law trade dress infringement, tortious interference, and deceptive trade practices under Mass. Gen. Laws ch. 93A. The district court granted summary judgment to Bridgewater on all claims except those of tortious interference and violation of 93A. *Yankee Candle Co. v. Bridgewater Candle Co.*, 99 F.Supp.2d 140 (D.Mass.2000) [hereinafter *Yankee I* ]. In a later memorandum, the district court determined that Yankee's evidentiary support for its federal copyright and trade dress claims was irrelevant with respect to the state claim for tortious interference,

and substantially limited Yankee's ability to introduce such evidence. *Yankee Candle Co. v. Bridgewater Candle Co.*, 107 F.Supp.2d 82, 86–87 (D.Mass.2000) (memorandum) [hereinafter *Yankee II* ]. The court also concluded that the alleged actionable behavior was not committed "primarily and substantially" in Massachusetts, and granted Bridgewater summary judgment on Yankee's 93A claim. *Id.* at 88–89. Yankee then stipulated as to the voluntary dismissal of its tortious interference claim so that it could appeal.

On appeal, Yankee challenges: (i) the grant of summary judgment on its copyright claims; (ii) the grant of summary judgment on its federal trade dress claims; (iii) the district court's decision to narrow the scope of trial and severely limit allowable evidence; and (iv) the grant of summary judgment on the 93A claim. For the reasons explained herein, we affirm the opinions of the district court.

## I. Copyright Claims

■ Our review of the entry of summary judgment is *de novo*. *Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 428 (1st Cir.2000); *see also Folio Impressions, Inc. v. Byer Calif.*, 937 F.2d 759, 766 (2d Cir.1991) (appropriate to review district court's evaluation of substantial similarity *de novo* when only visual comparisons are required).

### A. The District Court Approach

Yankee claims that Bridgewater has infringed its copyright on the labels of nine candle fragrances.[1] The district court, proceeding in the following manner, concluded that Bridgewater's labels were noninfringing as a matter of law. First, applying the doctrines of "merger" and "scene-a-faire," the court determined that, to prevail, Yankee had to show that Bridgewater's labels were "nearly identical" to Yankee's. *Yankee I*, 99 F.Supp.2d at 145. Second, in making this comparison, the district court ignored "certain similarities" that it viewed as "crude, physical elements" not entitled to copyright protection, such as the label's rectangular shape, its gold border, and the use of a full-bleed style of photography.[2] *Id.* at 148. Third, the court applied the "ordinary observer" test to the remaining elements of the copyrighted label, ultimately concluding that no reasonable juror could conclude that any of the Bridgewater labels were substantially similar to the corresponding Yankee label. *Id.* at 148–50.

Yankee claims that the district court erred by ignoring its proffered evidence of actual copying. As a result, says Yankee, the court incorrectly engaged in a point-by-point comparison of protected elements as opposed to a broader determination based on the "total look and feel" of the entire label. Yankee also argues that the district court was over-enthusiastic in determining which elements of the labels were not protected, and thus used an improper baseline for its determination of substantial similarity. For purposes of this appeal, we assume that Yankee provided sufficient evidence of actual copying to survive summary judgment.[3] After ap-

---

1. The alleged infringing labels are of Bridgewater fragrances Eucalyptus, Cranberry, Gardenia, Mulberry, Peach, Raspberry Jubilee, French Vanilla, Cinnamon Rolls, and Apple Pie. *Yankee I*, 99 F.Supp.2d at 148–50. These correspond to Yankee fragrances of the same names, although Yankee calls four of the corresponding fragrances Fresh Peach, Raspberry, Cinnamon, and Spiced Apple. *Id.*

2. A "full-bleed" photograph contains no border or visual separation between the photograph and the perimeter of the label. *Yankee I*, 99 F.Supp.2d at 148 n. 2.

3. The district court held to the contrary. *Yankee I*, 99 F.Supp.2d at 144.

plying the relevant law, we conclude that even if Bridgewater actually copied Yankee's labels, the merger doctrine operates so that no reasonable juror could have found Bridgewater's labels to be "substantially similar" to those of Yankee. We therefore affirm the grant of summary judgment on this basis.

## B. Applicable Law

■ To prevail on a claim of copyright infringement, the plaintiff must show both ownership of a valid copyright and illicit copying. *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Matthews v. Freedman*, 157 F.3d 25, 26–27 (1st Cir. 1998). There is no dispute here as to the first prong of this test; Yankee retains valid copyrights on the nine candle labels at issue. The second question is a more complicated one.

■ This Court conducts a two-part test to determine if illicit copying has occurred. First, a plaintiff must prove that the defendant copied the plaintiff's copyrighted work, either directly or through indirect evidence. *Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 60 (1st Cir. 2000). Second, "the plaintiff must prove that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.' "[4] *Id.; see also Skinder–Strauss Assocs. v. Mass. Continuing Legal Educ., Inc.*, 914 F.Supp. 665, 672 (D.Mass. 1995) ("Even evidence of actual copying

may be insufficient, however, if this copying was not substantial."). Because we assume, for purposes of this appeal, that actual copying has taken place, we move directly to the second prong.

■ Whether there is substantial similarity between copyrightable expressions is determined by the "ordinary observer" test. *Concrete Mach. Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 607 (1st Cir. 1988). "The test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protected expression by taking material of substance and value." *Id.* (quoting *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 541 (3d Cir. 1986)). The determination of whether an allegedly infringing label is substantially similar to its alleged model or influence is not so simple a task, however, as a strict visual comparison of the two items. Any comparison between the two works must be informed by a key theoretical foundation of copyright law: that "[i]deas cannot be copyrighted," *id.* at 606 (citing *Harper & Row, Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 547, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)), and therefore that "[a]n artist 'can claim to own only an original manner of expressing ideas,' not the ideas themselves," *id.* (quoting *Cooling Sys. & Flexibles v. Stuart Radiator*, 777 F.2d 485, 491 (9th Cir.1985)). Because of this dichotomy between "idea" and "expression," only the "protected expression" is relevant to an

---

4. Much of the confusion in this area of the law may be traced to the dual use of the term "substantially similar." *See Matthews*, 157 F.3d at 27 n. 1. First, if there is no evidence of actual copying, as is usually the case, *Concrete Mach. Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 606 (1st Cir.1988), a plaintiff may prove that copying occurred by showing access and substantial similarity, *id.* We have described this aspect of substantial similarity as an "evidentiary inference." *Matthews*, 157 F.3d at 27 n. 1. Second, once copying has been proven, the plaintiff must show that the "alleged infringing work is 'substantially similar' to the protected expression in the copy-written work." *Id.* at 27. Due to our assumption of sufficient evidence of actual copying, only the second use of the term is at issue here.

evaluation of substantial similarity. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir.2000). We must first consider, then, to what extent the Yankee labels are protected expression.[5]

██ In determining what aspects of the Yankee labels are protected under copyright law, we follow essentially the same path as did the district court. We first "dissect" the work to remove those aspects not protected by copyright. Despite Yankee's argument to the contrary, this Court has indicated that dissection analysis is an appropriate method of evaluating substantial similarity even when actual copying has occurred. "By dissecting the accused work and identifying those features which are protected . . . [t]he court can also determine . . . those aspects of the work that . . . should be considered in the . . . comparative analysis under the ordinary observer test." *Concrete Mach.*, 843 F.2d at 609. Second, we apply the doctrines of merger and scene-a-faire to determine *how* "substantially similar" the copy must be to infringe. *Id.* at 609 n. 9 ("For example, the court may find that the idea and expression are so inseparable that copying of the work is not prohibited or that only exact reproduction of the work will justify a finding of infringement.").

There may be a qualification to the dissection test of some importance in certain cases. In *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1003 (2d Cir.1995), the Second Circuit suggested that the dissection test may not fully resolve the legal issues where the copyright holder claims that the copyrighted material is essentially a host of uncopyrightable individual elements that have been arranged in a

unique way that qualifies them for copyright protection. *Cf. Feist*, 499 U.S. at 362, 111 S.Ct. 1282 (copyright available for compilations of unprotectible facts). This Court, however, has been more enthusiastic than the Second Circuit about the use of dissection analysis to disaggregate a visual work into its component elements for the purpose of removing the unprotectible elements contained within. *Compare Concrete Mach.*, 843 F.2d at 609, *with Knitwaves*, 71 F.3d at 1003.

At any rate, we do not necessarily reject this qualification but think that it has no direct application here. Our reasons for thinking that there is nothing very unique in *this* combination of elements follows from our discussion of the nature of the unprotected elements, the issue to which we turn shortly. Moreover, we are confident that the district court, in removing the "crude, physical elements" described in Parts I.A and I.C, did not over-dissect the Yankee label. The fact that significant copyrightable material remained (prior to the application of the merger doctrine) is, in our minds, persuasive that the appropriate level of dissection occurred. *See Leigh*, 212 F.3d at 1215 ("As long as the analysis is not overly detached and technical, it can adequately assess both the effect of the protected, original elements of [the work] and the contribution of those elements to the work as a whole.").

### C. Unprotected Elements of the Yankee Labels

██ The district court determined that the "rectangular, gold-bordered name plate, [the] full-bleed photos, and [the use of] similarly sized labels," were "crude,

---

5. The extent to which the Yankee labels contain protected expression is a matter of law, determined by the court. Once this determination is made, the question of whether two works are substantially similar (and corre-

sponding application of the ordinary observer test) is a matter for the trier of fact unless summary judgment is proper. *See, e.g., Concrete Mach.*, 843 F.2d at 608–09.

physical elements [that] do not enjoy copyright protection," and therefore only evaluated the photographic images on the labels for infringement. *Yankee I*, 99 F.Supp.2d at 148. Yankee contends that its choices to use such elements were "discretionary," and must be protected by copyright because other choices were possible. We agree with the district court. The "discretion" claimed by Yankee involves (i) the use of a rectangular "title plate" with block lettering on a white background; (ii) the imposition of that title plate, centered, on a photographic representation of the candle fragrance; and (iii) a rectangular border around the photograph. This collection of common geometric shapes with a particular photographic technique is not sufficiently original to qualify for copyright protection. *See Atari Games Corp. v. Oman*, 979 F.2d 242, 247 (D.C.Cir.1992) ("We do not in any way question the Register's position that 'simple geometric shapes and coloring alone are per se not copyrightable.'"); *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 545 (2d Cir.1959) (circular, rectangular, and octagonal shapes not protected); *William S. Geiger Corp. v. Gigi Accessories, Inc.*, No. 97 Civ. 5034(JSM), 1997 WL 458668, at *2 (S.D.N.Y. Aug.11, 1997) (plaintiff has no right to copyright a geometric shape).

■ Moreover, the use of a border element is an essentially functional design choice not protected by copyright. *See* 17 U.S.C. § 101 (providing copyright protection for "works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects"); *CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1519–20 (1st Cir.1996) (copyright law denies protection to forms of expression directed solely at functional considerations). A border is a common method of separating a photograph from a background; the use of gold as the border color is a common method of signifying opulence and quality. *See Pubs. Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 341 (7th Cir.1998). Likewise, copyright does not provide protection for the particular style of photography chosen by Yankee (full-bleed). To do so would impermissibly narrow the possibilities available to other label designers. *See Designer's View, Inc. v. Publix Super Markets, Inc.*, 764 F.Supp. 1473, 1479 (S.D.Fla.1991) (medium of artwork not protected by copyright).

### D. Merger

■ Having separated the unprotected title plate, border elements, and style of photography from the photographs themselves, we now turn to the photographs to determine if the Bridgewater labels are infringing. The district court found that for six of the nine labels in question, there was "only one way to express the idea of these fruits and flowers: by depicting their likeness." And although the district court held that the remaining three labels (French Vanilla, Spiced Apple/Apple Pie, and Cinnamon/Cinnamon Rolls) expressed more subtle ideas open to greater possibilities of representation, even for those depictions "the idea merge[d] with the expression" and therefore allowed for few choices of subject matter. As a result, the district court held that, as a matter of law, there could be no infringement unless Bridgewater's photographs were "nearly identical" to Yankee's. *Yankee I*, 99 F.Supp.2d at 145–46. Yankee claims that the merger doctrine does not apply because infinite ways exist to depict a fruit, flower, or common flavor such as french vanilla. Again, we agree with the district court's approach.

■ In *Concrete Machinery*, we explained the rationale behind the merger doctrine:

Some ideas admit of only a limited number of expressions. When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression. [Even] [w]hen the idea and its expression are not completely inseparable, there may still be only a limited number of ways of expressing the idea.

843 F.2d at 606 (internal citations omitted). In such cases, the plaintiff has the heavy burden of showing "near identity" between the works at issue. *Id.* at 606–07 (citing *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1167 (9th Cir.1977), and *Flag Fables Inc. v. Jean Ann's Country Flags & Crafts, Inc.*, 730 F.Supp. 1165, 1171 (D.Mass.1990)). This heightened showing "is necessary because, as idea and expression merge, fewer and fewer aspects of a work embody a unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not *required* by the idea." *Id.* at 607 (citing *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 908 (3d Cir.1975)).

 In general, the merger doctrine is most applicable where the idea and the expression are of items found in nature, or are found commonly in everyday life. *See, e.g., Designer's View*, 764 F.Supp. at 1478. For example, we invoked the merger doctrine in *Concrete Machinery* where the idea at issue was a "realistic-looking life size deer." 843 F.2d at 607; *see also Leigh*, 212 F.3d at 1214–15 (photograph of statue in public domain); *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir.1971) (pin of a "jeweled bee"). As the district court found, six of the labels at issue were fruits and flowers found in nature; the remaining three were representations of common flavors. For the six natural items, there were few associated expressions, of which the most obvious was a realistic representation of the fruit or flower at issue. For the three flavors, the most obvious expression was a realistic representation of a food commonly associated with that flavor.[6] Because the merger doctrine applies, the copyright on Yankee's labels does not prevent Bridgewater from using the same subject matter on its labels, even if the genesis for Bridgewater's choice of subject matter was Yankee's labels.

 The merger doctrine does not, however, allow the identical reproduction of photographs of realistic objects when there are sufficient details in those photographs to make them unique. *Concrete Mach.*, 843 F.2d at 609–10 (finding possibility of infringement of concrete deer based on stylized posture and facial expression). If Bridgewater had scanned Yankee's labels into a computer and reproduced them exactly, it would have certainly infringed Yankee's copyrights on those labels. Even if Bridgewater had taken its own photographs, but had arranged the subjects in a "nearly identical" manner to that of Yankee, a jury could have found the requisite showing of substantial similarity to support copyright infringement. Moreover, although Yankee does not enjoy copyright protection on the subject matter of its photographs because of the merger doctrine, its choices as to lighting, background, angle and positioning are protect-

---

**6.** It is true that more than one food may meet this definition: for example, cinnamon can be represented by cinnamon sticks, cinnamon rolls, or cinnamon toast. However, all that is required for application of the merger doctrine is that there be a sharply limited number of choices. We think that in the case of everyday flavors such as french vanilla, cinnamon, and spiced apple, such is the case.

ed. *Leigh,* 212 F.3d at 1215; *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.1992). We now proceed to compare the specific labels at issue.

### E. The Labels

 After accounting for the unprotected elements of the Yankee label and the constraints of the merger doctrine, the district court closely examined each of the allegedly infringing labels, and concluded that no reasonable juror could conclude that the Bridgewater label was "substantially similar" to the corresponding Yankee label. *Yankee I,* 99 F.Supp.2d at 148–50. Although summary judgment is often inappropriate on the question of substantial similarity, *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.1980), where reasonable minds cannot differ,

summary judgment is appropriate, *Segrets,* 207 F.3d at 62. Our independent review of the labels confirms the district court's analysis and holding.[7] Therefore we affirm the grant of summary judgment to Bridgewater on Yankee's copyright claims.

## II. Trade Dress Claims

### A. Purposes and Scope of Trade Dress Protection

 Yankee's second set of claims, for trade dress infringement, is brought pursuant to § 43(a) of the Lanham Act, which provides protection against the use of "any word, term, name, symbol, or device" that "is likely to cause confusion, or to cause mistake, or to deceive" as to the source of a product. 15 U.S.C. § 1125(a). The Lanham Act extends protection not

---

**7.** The district court performed an extensive comparison of corresponding labels which need not be repeated here at great length. *Yankee I,* 99 F.Supp.2d at 148–50. For purposes of illustration, however, we note a few of the significant differences in each set of photographs:

> The Bridgewater "Eucalyptus" label shows a eucalyptus plant, photographed from a distance, with thin white and purple flowers and small green leaves. The Yankee "Eucalyptus" label is taken from closer up, displays larger, darker green leaves, and both yellow and purple flowers.

> The Bridgewater "Cranberry" label contains only cranberries. The Yankee "Cranberry" label also contains the green leaves of a cranberry plant, and has many fewer cranberries on the label.

> The district court described the "Gardenia" labels as the most similar of any set. *Id.* at 148. Although both labels contain three flowers arranged in a triangle, the Bridgewater flowers are all white, while the Yankee flowers have yellow elements. The Bridgewater label also includes more green leaves, whereas the flowers themselves fill most of the Yankee photograph.

> The mulberries in the Bridgewater label are much redder than those in the Yankee label, which are a dark, almost black, color.

> The Yankee label also includes more well-defined leaves, which are the focal point of the photograph.

> The Yankee "Raspberry" label has many more leaves than the Bridgewater "Raspberry Jubilee" label, which is almost entirely filled with berries.

> The Bridgewater "French Vanilla" photograph has ice cream cones filled with vanilla ice cream. The photograph is taken so that all of the cones are in focus. The Yankee "French Vanilla" only features empty cones, with no ice cream. One cone is the focus of the picture; the rest are a blurry background.

> Both the Bridgewater fragrance "Cinnamon Rolls" and the Yankee "Cinnamon" display photographs of cinnamon rolls. However, the Yankee photograph also includes cinnamon sticks, while the Bridgewater rolls highlight the sugary frosting found on a cinnamon roll.

> Both the Bridgewater "Apple Pie" and the Yankee "Spiced Apple" contain photographs of apple pies. However, the Yankee photograph also features a basket and several apple slices. The Bridgewater photograph contains several whole apples. Also, in the Bridgewater photographs, the darkish filling is oozing out of the pies, while the Yankee pies are lighter in color and not leaking apple filling.

only to words and symbols, but also to "trade dress," defined as "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer." *Chrysler Corp. v. Silva,* 118 F.3d 56, 58 (1st Cir.1997) (quoting *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 999 (2d Cir. 1997)). The primary purpose of trade dress protection is to protect that which identifies a product's source. *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 35 (1st Cir.1998). Courts recognize trade dress claims based both on product packaging and on "product design/configuration." *See, e.g., Wal–Mart Stores v. Samara Bros., Inc.,* 529 U.S. 205, 213–14, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

 In order for trade dress to be protected under § 43(a), a plaintiff must prove that the dress is: (i) used in commerce; (ii) non-functional; and (iii) distinctive. *Lund,* 163 F.3d at 36. Distinctiveness may be either "inherent," that is, the "intrinsic nature [of the trade dress] serves to identify a particular source," *Wal–Mart,* 529 U.S. at 210, 120 S.Ct. 1339 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)), or "acquired," i.e., the trade dress has acquired a "secondary meaning" whereby the public views its "primary significance ... as identify[ing] the source of the product rather than the product itself," *id.* at 211, 120 S.Ct. 1339 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Finally, to prove infringement of protected trade dress, the plaintiff must show that another's use of a similar trade dress is likely to cause confusion among consumers as to the product's source. *Lund,* 163 F.3d at 43–44.

## B. The District Court Analysis

The district court identified three ways in which Yankee claimed that Bridgewater had infringed its trade dress: (i) by copying Yankee's method of shelving and displaying candles in its stores, called the "Vertical Display System"; (ii) by copying the overall "look and feel" of Yankee's Housewarmer line of candles; and (iii) by copying the design of Yankee's merchandise catalog, specifically its one fragrance per page layout. *Yankee I,* 99 F.Supp.2d at 150–51. The court first held that the Vertical Display System was "manifestly functional," both in its arrangement of candles by color and in its use of wooden shelving, and concluded that "Yankee cannot invoke the Lanham Act to appropriate such a conventional method of presenting its wares." *Id.* at 151–52.

The court then turned to the "look and feel" of the Housewarmer line of candles and the layout of the Yankee catalog. It concluded, with little explanation, that both claims alleged trade dress infringement of a product design/configuration, rather than infringement of product packaging. In accordance with the Supreme Court's decision in *Wal–Mart,* the district court thus held that neither aspect of Yankee's trade dress could be inherently distinctive as a matter of law. *Id.* at 152–53; *see Wal–Mart,* 529 U.S. at 213–14, 120 S.Ct. 1339 (holding that product design/configuration trade dress may never be inherently distinctive). The district court therefore turned to a determination of whether a genuine issue of material fact existed with respect to secondary meaning. *Yankee I,* 99 F.Supp.2d at 153.

As to the Housewarmer line of candles, the district court determined that the evidence introduced by Yankee had fallen far short of the "vigorous" evidentiary standard required to show secondary meaning in a product design/configuration case. *Id.*

at 153–54 (citing *Boston Beer Co. Ltd. P'ship. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir.1993), and *Duraco Prods. Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1453 (3d Cir.1994)). First, Yankee had failed to introduce any survey evidence, which this Court has described as the "preferred" manner of demonstrating secondary meaning. *See id.* at 154 (citing *Boston Beer*, 9 F.3d at 182). Second, Yankee had not introduced any circumstantial evidence indicating that the public had made a conscious connection between the trade dress at issue and Yankee as the source of that trade dress. *Id.*

As for the catalog, the district court simply concluded that "there is no question that Bridgewater's catalog is indeed Bridgewater's and not Yankee's," and that "[n]o fair minded person, looking at Bridgewater's document, could possibly view it as an attempt to 'pass off' the Bridgewater catalogue as the Yankee one." *Id.* at 155–56.

Lastly, although it had not found any of Yankee's trade dress sufficiently distinctive to qualify for protection, the district court held in the alternative that "no reasonable juror could conclude that there is a likelihood of confusion, where clearly marked company names are featured on the face of the products and catalogues." *Id.* at 156 (citing *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1045 (2d Cir.1992), and *Conopco, Inc. v. May Dep't Stores*, 46 F.3d 1556, 1559 (Fed. Cir.1994)).

## C. Yankee's Claims

On appeal, Yankee argues that the district court erred in several ways. First, Yankee contends that the district court ignored its "combination" claim defining its

trade dress as the *combination* of its Housewarmer series of labels, its choice of candle sizes and styles, its Vertical Design System, and its catalog layout. By disaggregating the features of its trade dress, says Yankee, the district court failed to analyze the "look and feel" of the entire Yankee product. Second, Yankee argues that the district court erroneously defined its trade dress as product design/configuration, and in so doing, proceeded directly to the question of secondary meaning without considering that the dress might be inherently distinctive. Third, Yankee argues that it introduced sufficient evidence of secondary meaning to survive summary judgment. Fourth, Yankee argues that it introduced sufficient evidence of likelihood of confusion to survive summary judgment had the district court needed to reach that issue. Although we agree with Yankee that the district court failed to address its combination claim as such and we entertain the possibility that the court incorrectly analyzed Yankee's claims under a product design/configuration rubric, we ultimately reach the same conclusion as the district court and affirm the grant of summary judgment, albeit using a different analysis. *Burns v. State Police Ass'n of Mass.*, 230 F.3d 8, 9 (1st Cir.2000) (this Court may affirm grant of summary judgment on any ground sufficiently indicated by the record).

### 1. Yankee's Trade Dress

We begin by sketching Yankee's claimed trade dress, which we read on appeal as defined in two possible ways. First, Yankee suggests that its trade dress is a combination of: (i) the Vertical Display System;[8] (ii) the catalog, with an

---

8. The district court found that the Vertical Display System is entirely functional, and

therefore not entitled to trade dress protection. *Yankee I*, 99 F.Supp.2d at 151–52. Al-

emphasis on its "one fragrance per page" layout; (iii) its candle shapes and sizes; (iv) the quantities of candles it sells as a unit; and (v) the Housewarmer labels, specifically their inclusion of (a) a full-bleed photograph, (b) a superimposed title plate with gold edging and lettering on a white background, (c) a rectangular shape, and (d) a reflective border.[9] Alternatively, Yankee describes its trade dress as the elements common to its Housewarmer labels, of which we have provided greater detail in the copyright section of this opinion.

### 2. Inherent Distinctiveness

### a. The Combination Claim

 Yankee argues that the distinct combination of elements comprising its candle sizes and shapes, quantities sold, labels, Vertical Design System, and catalog stem from "arbitrary" choices and are thus "inherently distinctive" and entitled to trademark protection. *See Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753 (inherently distinctive marks are entitled to protection). Certain types of trade dress, however, can never be inherently distinctive. *Wal–Mart*, 529 U.S. at 212–14, 120 S.Ct.

1339 (product design/configuration cannot be inherently distinctive); *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (color cannot be inherently distinctive). We find that Yankee's combination claim falls under the category of product design/configuration, and thus Yankee must prove that the dress has attained secondary meaning in order for it to be protected under the Lanham Act. *Wal–Mart*, 529 U.S. at 215, 120 S.Ct. 1339.

Yankee argues that because its products are candles, all the trappings associated with the sale of the candle—i.e., the candle-holders, the Vertical Display System, the labels, and the catalog—constitute product packaging, or at the very least a *"tertium quid . . .* akin to product packaging," categories of trade dress that may be inherently distinctive. *See Wal–Mart*, 529 U.S. at 215, 120 S.Ct. 1339 (citing *Two Pesos*, 505 U.S. at 773, 112 S.Ct. 2753).

 Although, as we explain below, Yankee's Housewarmer *labels* are product packaging and thus may be inherently distinctive, when combined with actual candle features, candle containers, the catalog,[10]

though we agree as to the functionality of the display, we note that a combination of functional elements may itself be entitled to trade dress protection. *Lund*, 163 F.3d at 37.

9. We note that Yankee has not been entirely consistent in its definition of its trade dress in its appellate brief. At times, it appears that Yankee is arguing that individual *features* of its product line, namely its labels, its catalogues and its Vertical Display System, deserve trade dress protection. This was the analysis undertaken by the district court. At other points, however, Yankee disclaims such an approach. We note that the burden to clearly identify the trade dress at issue is on the plaintiff. *See, e.g., Landscape Forms v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997). Moreover, at least one federal court has previously criticized Yankee for fail-

ing in this regard. *Yankee Candle Co. v. New England Candle Co.*, 14 F.Supp.2d 154, 162 (D.Mass.1998), *vacated pursuant to settlement*, 29 F.Supp.2d 44 (D.Mass.1998). After a careful review of the record, we conclude that Yankee has been sufficiently consistent as to these two descriptions of its trade dress for us to evaluate them on appeal.

10. We note that we are troubled by the inclusion of Yankee's catalog in its combination trade dress claim. A combination trade dress claim is one that includes a number of different features of a product or its packaging which, *taken together*, are potentially indicative of source. In this case, although the candles, their labels, and the Vertical Display System are all seen at the same time, the catalog is a *separate item* mailed to consumers at their homes. Moreover, Bridgewater's

and the in-store display system, the claim is no longer clearly a product-packaging one. Nor can the claim be categorized as product design/configuration, as that term has generally been defined to be limited to features inherent to the actual physical product: here, the candles. *See Wal–Mart*, 529 U.S. at 212, 120 S.Ct. 1339 (describing cocktail shaker shaped as penguin as a product design); *Lund*, 163 F.3d at 34–36 (kitchen faucets). We also do not see this claim as akin to the restaurant decor upheld as potentially inherently distinctive in *Two Pesos*, which the Supreme Court later described as a *"tertium quid* that is akin to product packaging." *Wal–Mart*, 529 U.S. at 215, 120 S.Ct. 1339; *see also Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F.Supp.2d 431, 451–53 (S.D.N.Y.2000) (finding that the overall layout of a wine store could be, and was, inherently distinctive). Yankee has not made a claim as to the overall appearance of an entire store, but has instead isolated certain characteristics of its candle display in stores. This strikes us as far closer to the design/configuration category. The fact that Yankee points to particular aspects of the candles themselves, namely their shapes and sizes, only confirms our categorization.

In *Wal–Mart*, the Supreme Court instructed us how to deal with claims that were at the margin of product design/configuration: "To the extent that there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." 529 U.S. at 215, 120 S.Ct. 1339. We follow that advice here. To prevail on its combi-

nation claim, Yankee must show that its trade dress has acquired secondary meaning.

**b. Labels**

Yankee also claims that unique features of its Housewarmer labels constitute an inherently distinctive trade dress. The district court found that the labels were also product configuration/design, and thus could not be inherently distinctive as a matter of law. *Yankee I*, 99 F.Supp.2d at 153. We disagree. Detachable labels are a classic case of product packaging, and therefore may be inherently distinctive. *See, e.g., Fun–Damental Too*, 111 F.3d at 1000–01. Although the district court did not determine whether the Housewarmer labels were inherently distinctive, we are convinced that the label elements highlighted by Yankee do not meet the inherent distinctiveness test of *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976). We therefore uphold the district court's grant of summary judgment on this basis.

Under *Abercrombie*, trademarks are divided into five categories: generic, descriptive, suggestive, arbitrary, and fanciful. *Lund*, 163 F.3d at 39. If a mark falls into one of the latter three categories, it is deemed to be inherently distinctive. *Id.* Because the *Abercrombie* test was first applied to word marks, *see Abercrombie*, 537 F.2d at 9, it may be difficult to apply to visual marks or trade dress, *Lund*, 163 F.3d at 39. The Supreme Court, however, has endorsed the use of the *Abercrombie* test in the evaluation of visual marks, as well as in the assessment of product pack-

catalog is a wholesale one, sent only to retailers. Even if we were willing to accept that Yankee's catalog may constitute part of its trade dress, and even if Bridgewater's catalog is eerily similar to Yankee's, we do not see how that similarity could contribute to any

consumer confusion. At any rate, because we conclude that Yankee must establish that its combination has acquired secondary meaning, and has not in fact done so, whether the catalog is included or not in the combination claim is ultimately irrelevant.

aging trade dress claims. *Id.* (citing *Two Pesos*, 505 U.S. at 768–69, 112 S.Ct. 2753).

This Court, however, has noted that "[w]e do not believe that the Supreme Court's endorsement of the *Abercrombie* test in *Two Pesos* requires a strict application of the *Abercrombie* test in all contexts...." *Id.* at 40. Instead, we have found it appropriate to supplement the somewhat bare-boned *Abercrombie* categories with the questions asked in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342 (C.C.P.A.1977). In *Seabrook*, inherent distinctiveness was determined by reference to: (i) whether the design was a common or basic one; (ii) whether it was "unique or unusual" in the field; (iii) whether it was a refinement of a common form of ornamentation; and (iv) "whether it was capable of creating a commercial impression distinct from the accompanying words." [11] *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 141 (1st Cir.1985) (quoting *Seabrook*, 568 F.2d at 1344). "In reality [the question is] whether the [dress] is so unique, unusual or unexpected in this market that it will automatically be perceived by customers as an indicator of origin." *Lund*, 163 F.3d at 40 (citing 1 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8.13 (4th ed.1996)); *see also McKernan v. Burek*, 118 F.Supp.2d 119, 124 (D.Mass.2000) (describing this question as the "*Lund* test" for inherent distinctiveness).

Furthermore, in evaluating the inherent distinctiveness of Yankee's packaging, we must consider the fact that although Yankee's Housewarmer labels have obvious similarities, they also differ significantly from one another, in that they necessarily display different pictures corresponding to their particular candle fragrance. In other words, Yankee seeks to protect features common to a set of labels, as opposed to a specific label common to a host of Yankee goods. A trade dress plaintiff seeking to protect a series or line of products faces a particularly difficult challenge, as it must show that the appearance of the several products is "sufficiently distinct and unique to merit protection." *Landscape Forms*, 113 F.3d at 380; *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32–33 (2d Cir.1995). Moreover, trade dress claims across a line of products present special concerns in their ability to artificially limit competition, as such claims are generally broader in scope than claims relating to an individual item. *Landscape Forms*, 113 F.3d at 381.

Yankee has focused on the "arbitrary" choices it made in designing its label, and has for this reason introduced into evidence numerous possibilities of alternative label designs. While we appreciate that there are many different potential ways of creating a candle label, we think Yankee's approach ignores the focus of the inherent distinctiveness inquiry. As we detailed in the copyright section of this opinion, Yankee's label is essentially a combination of functional and common features. *See Pubs. Int'l*, 164 F.3d at 341 (gold coloring is a prime example of aesthetic functionality, because it connotes opulence). Although such a combination may be entitled to protection where secondary meaning is shown, *Lund*, 163 F.3d at 37, it is less likely to qualify as inherently distinctive, *Jeffrey Milstein*, 58 F.3d at 32. While the

---

**11.** We note that other circuits may be less willing to apply this "gloss" on the *Abercrombie* test when product packaging is at issue. For example, despite noting that "[w]e are not so confident that the *Abercrombie* analysis is more naturally fit for product packaging cases" than is a *Seabrook*-like test, the Second Circuit has resisted the temptation to refine the *Abercrombie* test for visual marks or trade dress. *Landscape Forms*, 113 F.3d at 379.

particular combination of common features may indeed be "arbitrary," we do not think that any reasonable juror could conclude that these elements are so "unique and unusual" that they are source-indicative in the absence of secondary meaning. *Lund,* 163 F.3d at 40.

### 3. Secondary Meaning

■■■■ Having concluded that neither trade dress claim made by Yankee qualifies for protection based on its inherent distinctiveness, we next address whether Yankee has introduced sufficient evidence to survive summary judgment on the question of secondary meaning. As evidence of secondary meaning,[12] Yankee points to: (i) its advertising campaign featuring pictures of its products with the claimed trade dress; (ii) its continuous and virtually exclusive use of its trade dress since 1995; (iii) its high sales figures for Housewarmer candles; (iv) evidence from Bridgewater's files indicating that retailers identify a resemblance between Bridgewater's styles and Yankee's; (v) testimony by a Bridgewater's sales agent as to the distinctiveness of the Yankee trade dress; (vi) testimony by Bridgewater and Yankee employees as to the distinctiveness of Yankee's claimed trade dress; (vii) evidence of actual consumer confusion between Bridgewater and Yankee products; and (viii) evidence of intentional copying by Bridgewater.

■■■■ This Court has said that "[p]roof of secondary meaning entails vigorous evidentiary requirements." *Boston Beer,* 9 F.3d at 181 (quoting *Perini Corp. v. Perini Constr.,* 915 F.2d 121, 125 (4th Cir.1990)). The only direct evidence probative of secondary meaning is consumer surveys and testimony by individual consumers. *Id.* Although survey evidence is not required, "it is a valuable method of showing secondary meaning." *Lund,* 163 F.3d at 42. Yankee has introduced no survey evidence here.[13] Yankee also cites no evidence that individual consumers associate the particular features at issue with Yankee.[14]

■■■■ Secondary meaning may also be proven through circumstantial evidence, specifically the length and manner of the use of the trade dress, the nature and extent of advertising and promotion of the trade dress, and the efforts made to promote a conscious connection by the public between the trade dress and the product's source. *See Boston Beer,* 9 F.3d at 182.

---

12. With respect to the question of secondary meaning, Yankee does not clearly distinguish the evidentiary support for its label claim from that supporting its combination claim. For purposes of this analysis, we assume that the adduced evidence may be relevant to both aspects of its claimed trade dress. We note, however, that secondary meaning faces a higher threshold in a product design/configuration case. *See Lund,* 163 F.3d at 42; *Duraco,* 40 F.3d at 1435.

13. Yankee has cited surveys, taken by Bridgewater, indicating that Bridgewater's trade dress is substantially similar to Yankee's. Although this evidence, if admissible, would be probative of a likelihood of confusion, it does not indicate that Yankee's trade dress has acquired secondary meaning.

14. The evidence that Yankee's retailers and distributors viewed the trade dress as distinctive is not probative of secondary meaning. "[S]econdary meaning occurs when 'the primary significance [of the trade dress] *in the minds of the consuming public* is not the product but the producer.'" *Lund,* 163 F.3d at 42 (quoting *Kellogg v. Nat'l Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73 (1938)) (emphasis added). The opinions of retailers and distributors active in the scented candle field and extremely familiar with Yankee products is hardly evidence of whether the "consuming public" forms the same association.

Other factors may include the product's "established place in the market" and proof of intentional copying. *Lund,* 163 F.3d at 42. Yankee has introduced substantial evidence that the Housewarmer line of candles and corresponding display have been in circulation since 1995, that Yankee spends significant resources advertising its Housewarmer line, and that sales of Housewarmer candles have been extremely successful. *See Yankee I,* 99 F.Supp.2d at 153–54. However, in concluding that Yankee had not made a sufficient evidentiary showing of secondary meaning, the district court focused on the lack of evidence as to advertising of the *specific* trade dress claimed, as well as the lack of evidence demonstrating a conscious connection by the public between the claimed trade dress and the product's source.

■ We believe the district court emphasized the relevant issues in conducting its analysis of secondary meaning. Proof of secondary meaning requires at least *some* evidence that consumers associate the trade dress with the source. Although evidence of the pervasiveness of the trade dress may support the conclusion that a mark has acquired secondary meaning, it cannot stand alone. To find otherwise would provide trade dress protection for any successful product, or for the packaging of any successful product. *See Seabrook,* 568 F.2d at 1344 (evidence of sales volume may be relevant to secondary meaning, but "is not necessarily indicative"). Such an open standard hardly comports with the "vigorous" evidentiary showing required by this Court, nor does it comport with the purposes of trade dress protection, namely "to protect that which identifies a product's source." *Lund,* 163 F.3d at 35. In the absence of *any* evidence that the claimed trade dress actually *does* identify a product's source, the trade dress should not be entitled to protection.

■ That being said, Yankee argues that, because its advertising contained pictures of its products incorporating the claimed trade dress, it was the type of "look-for" advertising that can, on its own, support a finding of secondary meaning. *See First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir. 1987). "Look-for" advertising is such that "encourages consumers to identify the claimed trade dress with the particular producer." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 662 (7th Cir.1995). In other words, it is advertising that specifically directs a consumer's attention to a particular aspect of the product. To be probative of secondary meaning, the advertising must direct the consumer to those features claimed as trade dress. *Id.* Merely "featuring" the relevant aspect of the product in advertising is no more probative of secondary meaning than are strong sales; again, to provide protection based on extensive advertising would extend trade dress protection to the label (or to the combination claim) without any showing that the consumer associated the dress with the product's source. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 824 (9th Cir.1993) ("While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the *effectiveness* of this effort to create it.") (emphasis added). The district court found that Yankee's advertising did not emphasize any particular element of its trade dress, and thus could not be probative of secondary meaning. *Yankee I,* 99 F.Supp.2d at 154. We agree.

■ We also do not find Yankee's evidence of intentional copying probative of secondary meaning. First, to the extent

Yankee seeks to use such evidence as secondary meaning of its *combination* trade dress, intent plays a particularly minor role in product design/configuration cases. *See, e.g., Duraco,* 40 F.3d at 1453 ("[A]ttempts to copy a product configuration [may] not be probative [because] the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product."). Given the highly functional nature of certain elements of Yankee's claimed combination trade dress, *see Yankee I,* 99 F.Supp.2d at 151–52, the concern that protection could prevent healthy competition in the scented candle field weighs heavily in this case.

■ The testimony that Bridgewater designers were, at times, told to make the labels look more like Yankee's is more troubling. *See Blau Plumbing, Inc. v. S.O.S. Fix-it, Inc.,* 781 F.2d 604, 611 (7th Cir.1986) (defendant's belief that trade dress has acquired secondary meaning provides some evidence that it actually has acquired secondary meaning). However, the relevant intent is not just the intent to copy, but to "pass off" one's goods as those of another. *Id.* Given that Bridgewater prominently displayed its trade name on its candles, we do not think that the evidence of copying was sufficiently probative of secondary meaning.

■ In sum, Yankee has not introduced any of the direct evidence—surveys or consumer testimony—traditionally used to establish secondary meaning. Although it has introduced some of the circumstantial evidence often used to support such a finding, the lack of any evidence that actual consumers associated the claimed trade dress with Yankee, as well as the lack of evidence as to confusion on the part of actual consumers,[15] renders this circumstantial evidence insufficient for a reasonable juror to find that the trade dress had acquired a secondary meaning. Yankee has not made the vigorous evidentiary showing required by this Court. The grant of summary judgment on Yankee's Lanham Act claim is affirmed.

### III. The Evidentiary Ruling

■ Following its grant of summary judgment on the copyright and trade dress claims, the district court granted (in substantial part) Bridgewater's motion to limit the scope of trial on the remaining tortious interference count. *Yankee II,* 107 F.Supp.2d at 85–88. First, after re-examining the text of Yankee's original complaint, the court concluded that as a pleading matter, the tortious interference count was animated by claims of misrepresentation rather than claims of copyright or trade dress infringement.[16] *Id.* at 86. For

---

**15.** Yankee does point to several consumer affidavits as indicative of actual consumer confusion. A close examination of these affidavits indicates that all of the confusion was premised on alleged misrepresentations by retail employees. For example, in one case, an employee allegedly told a consumer that Yankee had been taken over by Bridgewater; the consumer believed this story because the candles had somewhat similar labels. Yankee has adduced *no* evidence, as far as we can tell, that any consumer (on their own accord) examined a Bridgewater candle and thought that it had been made by Yankee. The fact that Bridgewater candles prominently display

the Bridgewater trade name makes this lack of evidence unsurprising. *Pampered Chef, Ltd. v. Magic Kitchen, Inc.* 12 F.Supp.2d 785, 795 (N.D.Ill.1998); *Swisher Mower & Mach. Co. v. Haban Mfg., Inc.,* 931 F.Supp. 645, 650 (W.D.Mo.1996).

**16.** The relevant paragraphs of the Complaint are ¶ 108 and ¶ 110, under the heading of "Count IV—Tortious Interference."

¶ 108. The allegations of paragraphs 1–107 are realleged and reincorporated by reference as if fully set forth herein.
¶ 110. Bridgewater knew of these advantageous and prospective business relation-

that reason, it held that Yankee could not use evidence of copyright or trade dress infringement to support its tortious interference claim, because such evidence was irrelevant to claims of misrepresentation. *Id.* Second, to the extent that Yankee sought to use the evidence to establish "improper motive," one element of tortious interference, the court noted that: (i) federal copyright law preempts any tortious interference claim based on copyright infringement; (ii) although the Lanham Act does not similarly preempt common law trade dress claims, the "factual void" in the record made such evidence irrelevant; [17] and (iii) any evidence of "sharp practices" would, at best, be cumulative. *Id.* at 86–87.

We begin with the question whether the tortious interference count should be read to incorporate the copyright and trade dress claims. We need not decide whether the "liberal" approach to reading complaints is inconsistent with the district court's conclusion. *See* Fed.R.Civ.P. 8(f) (district court to construe the pleading so "as to do substantial justice"); *Beacon Theatres v. Westover*, 359 U.S. 500, 506, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (pleadings to be liberally construed under Federal

Rules of Civil Procedure). Even if the district court erred in its construction of the complaint, it is beside the point as Yankee did not prevail on the copyright or trade dress claims. Assuming that those claims should be read as incorporated into the tortious interference count, they have been decided against Yankee and we have upheld that decision.

Yankee also alleges that their pleadings set forth a complex "scheme" consisting of actions akin to copyright and trade dress infringement, misrepresentation, misappropriation of goodwill, wrongful use of employees to target particular customers, and wrongful use of scare tactics to pressure customers into switching candle suppliers. Our reading of the complaint supports the district court's determination that no such scheme was alleged. Furthermore, at a March 13 hearing on summary judgment, Yankee clearly indicated that it viewed copyright and trade dress infringement as entirely separate methods of supporting a tortious interference count, rather than as aspects of a general misrepresentation scheme. No matter our standard of review of the district court's construction of Yankee's pleading, we believe that it was done correctly in this respect.[18] *See Krouse v. Am. Sterilizer Co.*, 126 F.3d

---

ships, and intentionally acted with both improper means and an improper motive for the purpose of damaging Yankee Candle's advantageous and prospective business relationships. Bridgewater's unjustified and intentional interference with the advantageous and prospective business relationships consisted of at least using former Yankee Candle sales agents to, among other things: (a) disseminate false and misleading information concerning Yankee Candle; (b) disparage Yankee Candle's products; (c) contact Yankee Candle's customers for the purpose of informing them that Yankee Candle could or would no longer service their needs; and then (d) directly solicit business from Yankee Candle's customers. Paragraphs 1–107 were the portions of the Complaint supporting Yankee's claims of

copyright infringement, trade dress infringement under the Lanham Act, and common law trade dress infringement.

**17.** Moreover, the district court had already granted summary judgment on one count of common law trade dress, *Yankee I*, 99 F.Supp.2d at 156–57, and thus viewed Yankee's effort to premise its tortious interference claim on the state trade dress claim as a mere "change in label," *Yankee II*, 107 F.Supp.2d at 87.

**18.** Given that the parties did not extensively brief this issue, we are loath to decide at what level this Court reviews the construction of pleadings by the district court. We have found only one case vaguely on point, which suggests an abuse of discretion standard. *In*

494, 499 n. 1 (3d Cir.1997) (court will not read causes of action into a complaint when they are not present); *Rodríguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1171 (1st Cir.1995) (fundamental purpose of pleading is to afford party fair notice of claims asserted against him and the ground on which those claims rest).

 Alternatively, Yankee argues that the dismissal of the copyright and trademark claims is not dispositive because the underlying evidence may still be pertinent to proof of improper motive, which may in turn be a factor in establishing tortious interference. *See Restatement (Second) of Torts* § 767. Certainly in principle, evidence relevant to a failed claim might be of independent relevance to a surviving claim resting on different elements. *See Kattar v. Demoulas*, 433 Mass. 1, 739 N.E.2d 246, 257 (2000). However, the district court did not reject the use of the evidence simply because it supported a failed claim, but rather because of considerations peculiar to this case.

In substance, the district court pointed to the fact that the specific, concrete misrepresentations which were asserted could easily have been the subject of direct evidence at trial (if Yankee had not thereafter chosen to dismiss the misrepresentation claim in order to gain a prompt appeal on the evidentiary and other rulings). The evidence relating to the alleged copyright and trade dress violations had no bearing on whether the representations had been made. As to motive, any inference from the excluded evidence would prove cumulative (at best). The district court could easily have added that the excluded evidence could create substantial confusion and delay, given that the more obvious use of the evidence would be to support the defunct copyright and trade dress claims. *See* Fed.R.Evid. 403.

 In general, we review judgment calls that certain evidence is either irrelevant or cumulative for abuse of discretion. *Faigin v. Kelly*, 184 F.3d 67, 79–80 (1st Cir.1999). Yankee argues that our review here should be *de novo* because the district court based its ruling on a theory that evidence relating to a dismissed claim is automatically inadmissible with respect to a claim that proceeds to trial. We do not read the district court's opinion as resting on any such *per se* ground. Rather it appears to us to be an amply justified determination by the district court to keep the preserved claim focused on the issue of misrepresentation and to avoid the reintroduction through the back door of evidence whose main thrust was to establish counts already dismissed.

## IV. The 93A Claim

 Defendants are exempt from liability under 93A if the alleged misconduct occurred primarily and substantially outside Massachusetts. *Roche v. Royal Bank of Canada*, 109 F.3d 820, 829 (1st Cir.1997). The burden of proof as to this issue is on the defendants. *Id.* Whether defendants have satisfied this burden is a question of law, reviewed *de novo* by this Court. *Id.*

 Three factors are relevant in making this determination: (i) where the defendant committed the alleged deception; (ii) where plaintiff was deceived and acted upon the deception; and (iii) the situs of plaintiff's losses stemming from the deception. *Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1265–66 (1st Cir.1990). The district court held that the first factor weighed in Bridgewater's favor, as any misconduct occurred at Bridgewater's principal place of business, outside

---

*re Zinke*, No. CV–91–0805(ILG), 1991 WL 107815, at *3 (E.D.N.Y. May 31, 1991) (bank-

ruptcy judge's construction of pleadings reviewed for abuse of discretion).

Massachusetts. *Yankee II,* 107 F.Supp.2d at 88. In evaluating the second factor, the court evaluated where Yankee customers were allegedly deceived, *see Clinton,* 907 F.2d at 1265–66, and concluded that the vast majority of them were outside Massachusetts. *Yankee II,* 107 F.Supp.2d at 88. This factor therefore also weighed in Bridgewater's favor. Finally, the court determined that the third factor weighed in favor of Yankee, but that the third factor alone could not be dispositive. *Id.* at 88–89 (citing *Roche,* 109 F.3d at 831).

Yankee concedes that the district court's determination that the alleged conduct occurred primarily and substantially outside Massachusetts is correct unless we reverse the district court's evidentiary decision. As we have not done so, the district court's grant of summary judgment on the 93A claim is affirmed.

## V. Conclusion

For the reasons stated, the judgments of the district court are **affirmed**.